## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANTWANE WILLIAMS-BEY | No. 3:20-cr-00172-MPS |

## RULING ON DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

On November 2, 2022, a jury found Defendant Antwane Williams-Bey guilty on Count One of the Indictment, which charges murder through the use of a firearm during and in relation to, or in furtherance of, drug trafficking crimes in violation of 18 U.S.C. § 924(j). ECF No. 192. After the Government rested its case on October 28, 2022, Williams-Bey moved orally for a judgment of acquittal under Rule 29(a). ECF No. 177. On February 13, 2023, Williams-Bey filed a motion for judgment of acquittal under Rule 29 or, in the alternative, for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. ECF No. 214. The Government filed a brief opposing the motion on March 28, 2023. ECF No. 218. Williams-Bey filed a reply to the Government's brief on April 20, 2023. ECF No. 221. For the reasons set forth below, I deny Williams-Bey's motions.[1]

## I.    BACKGROUND

Count One of the Indictment (ECF No. 1) charges Williams-Bey as follows:

> On or about August 12, 2013, in the District of Connecticut, the defendant ANTWANE WILLIAMS-BEY, also known as "Buck," during and in relation to and in furtherance of drug trafficking crimes for which he may be prosecuted in a court of the United States, to wit: Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 841(a), and Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Sections 841(a)(l)

---

[1] Citations to the trial transcript, ECF Nos. 202-210, appear as "Tr." followed by the page number appearing in the top right hand corner of the transcript.

and 846, did knowingly and intentionally cause the death of Valentin Santos Jr. through the use of a firearm, which killing was murder as defined in Title 18, United States Code, Section 1111(a), in that the defendant, with malice aforethought, did unlawfully kill Valentin Santos Jr. willfully, deliberately, maliciously and with premeditation.

In violation of Title 18, United States Code, Section 924(j)(1).

## II.    LEGAL STANDARDS

### A.    Rule 29 Motion for Judgment of Acquittal

"[A] district court can enter a judgment of acquittal on the grounds of insufficient evidence only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *U.S. v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002). Courts conducting this review must "credit[] every inference that could have been drawn in the government's favor, and defer[] to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *U.S. v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016). "[A] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that" no rational trier of fact could have found guilt beyond a reasonable doubt. *U.S. v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (internal quotation marks omitted).[2]

### B.    Rule 33 Motion for a New Trial

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). This rule "gives the trial court broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of

---

[2] When, as in this case, the court reserves decision on a Rule 29 motion made after the Government rests, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). The evidence relied on in the discussion of the Rule 29 motion below was all introduced in the Government's case in chief.

justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (internal quotation marks

omitted). "When considering a motion for a new trial under Rule 33, a district court has

discretion to weigh the evidence and in so doing evaluate for itself the credibility of the

witnesses." *United States v. Truman*, 688 F.3d 129, 141 (2d Cir. 2012) (internal quotation marks

omitted). However, "the court may not wholly usurp the jury's role." *United States v. Robinson*,

430 F.3d 537, 543 (2d Cir. 2005) (internal quotation marks omitted).

> Because the courts generally must defer to the jury's resolution of conflicting
> evidence and assessment of witness credibility, it is only where exceptional
> circumstances can be demonstrated that the trial judge may intrude upon the
> jury function of credibility assessment. An example of exceptional
> circumstances is where testimony is patently incredible or defies physical
> realities . . . . The ultimate test . . . is whether letting a guilty verdict stand
> would be a manifest injustice. The trial court must be satisfied that competent,
> satisfactory and sufficient evidence in the record supports the jury verdict.
> The district court must examine the entire case, take into account all facts and
> circumstances, and make an objective evaluation. There must be a real
> concern that an innocent person may have been convicted.

*Ferguson*, 246 F.3d at 133-34 (internal quotation marks, alterations and citations omitted).

## III.    DISCUSSION

### A.    Rule 29 Motions for Judgment of Acquittal

#### 1.    Indictment

Williams-Bey first contends that "the indictment in this case was legally defective,"

reasserting "the same arguments" from his previous motion to dismiss "in order to preserve the

issues for further appellate review." ECF No. 215 at 5. These arguments are that the indictment

"fails to properly charge an offense,'" *id.*, "improperly takes the 'in furtherance' element of a

gun possession offense under § 924(c) and combines it with the 'during and in relation to'

language of an offense involving carrying or use of a firearm," *id.* at 6, and "is defective because

it does not include a separate count for either a 'crime of violence' or a 'drug trafficking

offense,'" *id.* I previously addressed these arguments in my ruling denying Williams-Bey's

motion to dismiss the indictment. *See* ECF No. 59 at 30-41. After reviewing both parties'
arguments on the motion to dismiss and my previous decision, I adopt the reasoning from my
previous decision, find that the indictment was legally sound, and so deny Williams-Bey's
motion for acquittal on the ground that the indictment was legally defective.

### 2. Sufficiency of the Evidence of Murder

Williams-Bey contends also that, even viewing the evidence in the light most favorable to
the Government, no rational jury could have found guilt beyond a reasonable doubt because
there was insufficient proof that Williams-Bey murdered Santos "during and in relation to" or "in
furtherance of" a drug trafficking offense or "in the course of a drug trafficking offense." ECF
No. 215 at 7, 9 (internal quotation marks omitted).[3] I disagree.

Williams-Bey first challenges the sufficiency of the evidence supporting the jury's
finding that he killed Santos. He reviews types of evidence that the Government did not present
but that he believes would have made the case against him stronger. He notes that at trial there
"was no physical or eyewitness evidence placing Mr. Williams-Bey near the crime scene on
Linmoore Street on the evening of August 12, 2013," nor was there "video surveillance, DNA,
fingerprint, or other physical evidence tying Mr. Williams-Bey to the location where Mr. Santos'
body was found (on either the night of August 12, 2013, or when the body was found on August
13)." ECF No. 215 at 8. Williams-Bey also emphasizes that "[n]o gun was ever recovered, and
there was no forensic evidence to establish a connection—through DNA evidence or otherwise—
between Mr. Williams-Bey and the bullets and/or casings recovered from Mr. Santos and the
crime scene." *Id.* Williams-Bey notes that the Government "relied heavily on cell phone

---

[3] Williams-Bey does not contest that the evidence was sufficient for the jury to find that he committed the predicate
drug offenses of possession with intent to distribute and conspiracy to possess with intent to distribute controlled
substances.

evidence" but "did not establish that his cell phone ever utilized the towers that were closest to the crime scene location during the relevant period." *Id.* Williams-Bey thus argues that there was insufficient evidence for the jury to conclude that he was the person who killed Santos.

It is well established that the Government "may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt." *U.S. v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002). And the evidence "must be examined in its totality, not by microscopic dissection of bits and pieces." *U.S. v. Barnes*, 604 F.2d 121, 156 (2d Cir. 1979). Further, the evidence "need not be of such a nature as to exclude every reasonable hypothesis of innocence." *Id.* Instead, "[t]he question is always whether the jury may rationally and logically infer the ultimate fact to be proved from basic facts, whether established by circumstantial or testimonial evidence, and the surrounding circumstances of the case." *U.S. v. Glasser*, 443 F.2d 994, 1007 (2d Cir. 1971) (internal quotation marks omitted). The evidence, viewed in the light most favorable to the Government, was sufficient for a jury rationally to conclude that Williams-Bey murdered Santos. I summarize that evidence below.

### a.  The Death of Valentin Santos

There was ample evidence from which a rational juror could find that Santos was killed the night of August 12, 2013. That evening, two of the people Santos was with before his death testified that he spent time with them at Brownell Avenue before going to meet other unidentified people. Tr. 857-861; Tr. 944, 946-47. There was testimony that Santos left his car with his friends before going to meet these other people, but that Santos was going to return to this group of friends later in the evening. Tr. 862-63; Tr. 948-49. Santos did not return to his friends and did not answer his phone when they called him later that evening. Tr. 863-64; 950-

51. The jury heard evidence that Williams-Bey was not at home the night that Santos was killed. Tr. 746.

And the jury heard testimony from an earwitness that shots were fired after 10:00pm near 323 Linnmoore Street in Hartford, Tr. 64-66; this testimony was supported by evidence that a 911 call was made at 10:18pm on August 12, 2013, Tr. 48, reporting shots fired near 323 Linnmoore Street, Tr. 49-51. Santos's body was discovered the morning of August 13, 2013, at 321 Linnmoore Street. Tr. 119-20.

Santos had been shot at least 10 times, *see* Tr. 311-15, 317, by a 9mm caliber firearm, Tr. 549. Most of Santos's gunshot wounds were in his back, legs, and buttocks. *See* Tr. 311-321. The medical examiner testified that Santos's wounds, while fatal, may have allowed him to continue to move for a few minutes before he died. Tr. 339-40. When Santos's body was discovered, "[h]is right hand appeared like he's clutching the ground, almost like he was attempting to crawl away" and it looked like "he had a handful of grass and dirt." Tr. 892. Twelve cartridge casings were recovered from the area around Santos's body. Tr. 560. The casings were recovered on or very close to Santos's legs, Tr. 136, and there was testimony that this suggested Santos was shot at close range, Tr. 891-92. One casing was located underneath Santos's body. Tr. 142-43. Each casing and identifiable bullet was ejected by the same firearm. Tr. 560, 571. Drugs, money, a cell phone, and other personal items were still on Santos's body when he was found. Tr. 145. This suggests that the motive behind the killing was not to rob Santos.

### b. Cooperator Testimony

The Government established Williams-Bey's motive for the murder by presenting evidence from cooperating witnesses that Williams-Bey was dealing drugs and that drugs and money were stolen from Williams-Bey in the period before Santos was murdered. The

6

cooperating witnesses also testified that Williams-Bey had made statements to them implicitly and explicitly admitting that he had killed Santos because he believed it was Santos who stole his drugs and drug money.

Brendan Salmon, a member of the same street gang that sold drugs on Orange Street as Williams-Bey, Tr. 354-55, testified that Williams-Bey "sold drugs" to earn money in the spring and summer of 2013, including crack and heroin, Tr. 349, and that he sold drugs in and around Orange Street, Tr. 352-53. Salmon recalled that Williams-Bey purchased heroin from Santos, Tr. 352, who Williams-Bey described as having "good stuff," Tr. 365-66. Salmon also sold crack and heroin in and around Orange Street, Tr. 348, he would sometimes get drugs from Williams-Bey, Tr. 348-49, and he had a drug dealing relationship with Williams-Bey going back several years, Tr. 353. Salmon testified that both he and Williams-Bey sold drugs every day as their regular course of business in the Orange Street area, Tr. 363, and they would discuss their drug sales and customers together, Tr. 364.

Salmon's testimony about Williams-Bey's drug dealing activities during the period in which Santos was murdered was corroborated by contemporaneous forensic evidence. On August 22, 2013— shortly after the murder of Santos—police officers recovered narcotics and packaging used to prepare narcotics for sale from a drawer in a bedroom in the Perez household at which Williams-Bey was staying. Tr. 494-495, 498-504. Williams-Bey stipulated that the material recovered from this drawer was crack cocaine and heroin. Tr. 1487. And Alicia Perez, who was romantically involved with Williams-Bey in August 2013, Tr. 829, testified that the recovered drugs were not hers, were kept in a drawer that Williams-Bey used, and that no one else shared her bedroom besides Williams-Bey. Tr. 837. Police officers also found drugs on

Santos's body when it was discovered, Tr. 145; Kimberly Baez, Santos's girlfriend, Tr. 192, testified that at the time of his murder he sold drugs for a living, Tr. 194.

Salmon also testified that only about a week before Santos was murdered Williams-Bey told him that someone "broke in[to] his house and robbed him" of "[d]rugs and money" that he kept hidden in a microwave, Tr. 368. Salmon recalled that Williams-Bey told him that Santos was the only person who knew that Williams-Bey stored his drugs and drug money in the microwave because Williams-Bey had shown only Santos this secret location while he was "moving fast" and "wasn't thinking." Tr. 368-70. And Salmon testified that during this conversation about one week before Santos was murdered, Williams-Bey stated that "he wasn't going out like that" when discussing his belief that Santos stole his drug stash. Tr. 370. Salmon also testified that a few days after this first conversation with Williams-Bey about the theft, but before Santos was murdered, he was in a car with Williams-Bey and others when Williams-Bey was "just going on about it, just talking about [Williams-Bey] getting robbed," and he recalled Williams-Bey stating that "it wasn't going to go on like that" and that Williams-Bey "was going to handle it." Tr. 374. Salmon testified that he was "[k]ind of" surprised that Williams-Bey was still talking about the theft from his apartment because it had been a few days since he first spoke to Williams-Bey about it. Tr. 375. He felt that Williams-Bey could not let the theft go because he kept talking about it. Tr. 375. According to Salmon, this second conversation occurred a few days after his first conversation with Williams-Bey about the theft, which happened approximately one week before the murder. Salmon's testimony suggests that Williams-Bey was fixated on the theft only a few days before Santos was murdered.

Salmon's testimony was corroborated by Eric Smith, another cooperating witness and another member of the gang that sold drugs on Orange Street. He testified that Williams-Bey told

8

him that Williams-Bey kept his money in a microwave in his apartment, that this money was stolen, and that Santos was the only person who knew where the money was stored. Tr. 1261-63. Smith testified that Santos and Williams-Bey had "some type of, like, drug relationship." Tr. 1262. Indeed, Smith testified that Williams-Bey believed Santos was responsible for the theft because Santos had learned about Williams-Bey's hiding place for drugs and drug proceeds—the microwave—during a drug transaction between the two in Williams-Bey's apartment. Tr. 1261-63 (Smith testifying about money stolen from Williams-Bey that he kept in a "hiding spot," a microwave; "[T]hey were doing a drug transaction and [Williams-Bey] was grabbing the money out of the hiding spot. And [Santos] saw where it was at"). Smith testified that Williams-Bey told Smith that he killed Santos because he believed that Santos was the thief. Tr. 1261.

Salmon also testified that in the days after Santos's body was discovered, Williams-Bey discussed the killing of Santos with him. The morning after Santos was murdered, Salmon met with Williams-Bey, who "was smiling" with a demeanor that led Salmon to infer that Williams-Bey had something to do with Santos's death. Tr. 380-81. Williams-Bey then told Salmon that he was "about to get rid of his car" by burning it. Tr. 381-82. Later, a few days after Santos was murdered, Tr. 383, Salmon became concerned that he might be caught in a crossfire and asked Williams-Bey what he should expect as far as "retaliation" from "[Santos's] people," Tr. 386. During this conversation, Salmon recalled Williams-Bey telling him that Santos invited Williams-Bey to rob a place with him, and that after they arrived at Linnmoore Street in Williams-Bey's vehicle, Williams-Bey used a 9mm caliber firearm to shoot Santos. Tr. 385, 387-91. Salmon testified that Williams-Bey was accompanied by Ruben Torres, another member of the Orange Street gang, who waited in the car while Williams-Bey pulled out a gun, began shooting at Santos, fixed a malfunction that prevented his gun from firing while Santos began to

run away, and then fired the gun's entire magazine at Santos. *Id.* This testimony was consistent with the large number of 9mm shell casings found at the scene and the large number of bullet wounds sustained by Santos.

Smith also testified that he discussed Santos's death with both Williams-Bey and another member of the Orange Street gang, Ruben Torres. Smith recalled that Williams-Bey told him in 2018 that he shot Santos in the presence of Ruben Torres and another member of the Orange Street group, known as "H.O.," emptying the magazine of his gun into Santos while being "right up on him," after which Santos "was on the floor trying to crawl like he was still alive." Tr. 1259-61. Smith later spoke to Ruben Torres on multiple occasions about Santos's murder. Smith testified that on one occasion Torres said that Santos's murder "was our work," meaning that Torres and Williams-Bey killed Santos, Tr. 1248-49, and that on another occasion Torres told Smith that the "only person who could tie [Torres] to [the murder] is Buck and H.O. because nobody else was there," Tr. 1269-70.

James Dudley, a third cooperating witness, also implicated Williams-Bey in the murder of Santos by providing testimony suggesting that Salmon's testimony was truthful. Dudley was a member of a street gang associated with Garden Street in Hartford that was in competition with the Orange Street gang. Tr. 592-93. Dudley met Williams-Bey while they were both in pretrial detention in 2017 and 2018. Tr. 594-95. Dudley testified that he and Williams-Bey associated with each other while detained because people from the same town typically associate with each other in detention regardless of any rivalries that exist outside of the detention facility. Tr. 595-96. Dudley also testified that Williams-Bey told him that Williams-Bey was "not feeling [Salmon]" because Salmon had cooperated with the Government in previous cases. Tr. 602-03. So Williams-Bey wanted Salmon to be detained in the same facility that he and Dudley were in

so that "he could keep an eye on him" because Salmon "knew information about something that could get him a lot of time." Tr. 604. And if Williams-Bey had the opportunity, he would "take [Salmon] down," which Dudley understood as Williams-Bey saying he would kill Salmon if he had the chance, Tr. 607-08.

Similarly, Smith provided testimony supporting Salmon's testimony as well as Dudley's. Smith testified that in 2016 Williams-Bey said that Salmon "knew about that situation," and so Williams-Bey had to "play him close" and eventually "get him out of the way." Tr. 1252-53. Later, when Smith was in a detention facility with Williams-Bey in 2017-2018, Smith recounted a time when Williams-Bey learned that Salmon had cooperated in another murder case and began crying, saying that Salmon was "going to give it up." Tr. 1256-58. Smith also testified that Jeffrey Acoff, Williams-Bey's cousin, said to him that "we had to get [Salmon]," which Smith understood to mean that they needed to kill Salmon. Tr. 1280.

Williams-Bey challenges the testimony of the three cooperating witnesses: Salmon, Smith, and Dudley. ECF No. 215 at 8-9. He argues that there were factors that tended to show that their testimony was unreliable and so it should have been disregarded: Each cooperating witness, he says, "came forward years after the homicide, and only after they were each facing serious criminal charges" and were thus "strongly motivated to lie for [their] own benefit." *Id.* at 9. But a Rule 29 motion for a judgment of acquittal "does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (internal quotation marks omitted). "It is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory, and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony."

11

*United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) (internal quotation marks omitted).

And at this stage I must "assum[e] that the jury resolved all questions of witness credibility . . . in

favor of the prosecution." *U.S. v. Requena*, 980 F.3d 30, 43 (2d Cir. 2020) (internal quotation

marks omitted, alteration in original); *United States v. Jespersen*, 65 F.3d 993, 998 (2d Cir.

1995) ("No more need be said than that [the witness] so testified, and that we are required to

resolve any issue regarding his credibility in the government's favor."). Even "the testimony of a

single accomplice witness is sufficient to sustain a conviction, provided it is not incredible on its

face . . . or does not def[y] physical realities." *United States v. Truman*, 688 F.3d 129, 139 (2d

Cir. 2012) (internal quotation marks and citations omitted). Williams-Bey does not argue that the

testimony of Salmon, Smith, and Dudley was incredible on its face or defied physical realities;

he instead makes arguments about their credibility as cooperating witnesses. These arguments

are—and were—properly made to the jury, not to me in a Rule 29 motion. *United States v.

Baker*, 899 F.3d 123, 130 (2d Cir. 2018) ("We will not attempt to second-guess a jury's

credibility determination on a sufficiency challenge, particularly when, as is the case here, trial

counsel already presented these same credibility arguments to the jury.") (internal quotation

marks omitted).

### c.   Cell Phone Evidence

The Government presented evidence from which a rational juror could find that Santos

and Williams-Bey called or texted each other many times the night that Santos was killed. *See*

Tr. 1428-29 (17 contacts between 8:08pm and 10:03pm on the night Santos was killed). The

Government presented evidence derived from cell phone records that, between 9:00pm and

9:29pm on August 12, 2013, Williams-Bey and Santos were both in Hartford but not in the same

neighborhood; during this time, the evidence suggested, they called each other several times. Tr.

1401-03; GX-80A at 4.[4] Between 9:32pm and 9:43pm, cell phone records suggest that Williams-Bey was traveling east, that Santos was approximately one mile east of Williams-Bey's initial location, and that Santos and Williams-Bey were not yet close together; they exchanged one phone call. Tr. 1403-04; GX-80A at 5. From 9:46pm to 9:50pm, Santos and Williams-Bey appear to begin converging together in Hartford, with Williams-Bey's phone calling Santos's phone three times—two of these calls connected to the same cell tower that Santos's phone used to receive the call. Tr. 1406-07; GX-80A at 6. The last text Santos's phone received was from Williams-Bey's phone at 9:46pm. Tr. 1429.

By 10:03pm, call records suggest that Santos and Williams-Bey were near each other in Hartford, as Santos's phone called Williams-Bey's phone by connecting to a cell tower less than one mile north of the cell tower on which Williams-Bey's phone received the call; there are two phone calls between Santos and Williams-Bey during this period. Tr. 1407-08; GX-80A at 7. The cell phone records are consistent with Williams-Bey and Santos "at least being in the general area of one another." Tr. 1413. And the last outgoing call placed from Santos's phone was at 10:03pm to Williams-Bey's phone. Tr. 1429. This call lasted 44 seconds. Tr. 1430. All incoming calls to Santos's phone after the 10:03pm call to Williams-Bey were routed to voicemail or did not connect to Santos's phone. Tr. 1407-09; 1430.

There were then no phone calls placed to or from the phones of Williams-Bey and Santos from 10:03pm to 10:23pm. Tr. 1410-11. As noted above, a 911 call was made at 10:18pm on August 12, 2013, Tr. 48, reporting shots fired near 323 Linnmoore Street, Tr. 49-51, the place where Santos's body was discovered on August 13, 2013, Tr. 97-99. Despite the frequent

---

[4] GX-80A is a map that includes information about outgoing and incoming phone calls from Williams-Bey's and Santos's cell phones. It was admitted as a full exhibit. Tr. 1423-24.

communication between Williams-Bey's phone and Santos's phone before 10:03pm, after 10:03pm Williams-Bey's phone never called Santos's phone again. *See* GX-79B.[5]

Between 10:23pm and 10:33pm, cell phone records place Williams-Bey's phone in the "southwest Hartford area," Tr. 1410, the same broad area as Linnmoore Street. His phone made calls at 10:23pm, 10:27pm, and 10:33pm; these calls connected with cell towers in a manner that suggested he was travelling west. Tr. 1412; GX-80A at 8. The 10:23pm and 10:27pm phone calls from Williams-Bey's phone used the same cell tower that Santos's phone had used at 10:01 for two calls. Tr. 1414. Then, at 10:38pm, twenty minutes after the 911 call reporting shots fired, Santos's phone received a phone call that placed that phone "far north," Tr. 1414, near the North Meadows neighborhood of Hartford, some 4.5 miles northeast of 323 Linnmoore Street. This call went to voicemail. Tr. 1414. Two minutes later, at 10:40pm, Williams-Bey's phone placed a call using a tower near to the one to which Santos's phone had connected to receive the 10:38pm phone call. Tr. 1414-15; GX-80A at 9. There was evidence that this pattern of calls was "consistent with both devices" leaving "the south Hartford area" and "travel[ing] north" while being in the same general vicinity in the North End of Hartford, 20 minutes after the 911 call reported shots fired near 323 Linnmoore Street. Tr. 1415.

From 10:41pm to 10:47pm, Santos's phone received two more calls—at 10:44pm and 10:47pm. These two calls were relayed from the same cell tower near the North Meadows neighborhood that Williams-Bey's phone used to place the 10:40pm call. Tr. 1415-16; GX-80A at 10. Williams-Bey's phone placed three phone calls during this period, all three of which used the same cell tower as Santos's phone; further, two of those calls used both the same tower and the same directional sector on the tower in the same minute that Santos's phone used to receive

---

[5] GX-79B consists of cell phone records and was admitted as a full exhibit. Tr. 929.

the 10:44pm and 10:47pm calls, strongly suggesting that the phones were in the same vicinity during those calls. Tr. 1416. The two calls received by Santos's phone during this period were the last two calls the phone ever received. After these calls, the cell network was unable to "find the [Santos] phone to pass down the call; i.e., the phone is not on the network." Tr. 1416-17.

From this cell phone evidence, a rational jury could have found that 20 minutes after the 911 call reporting shots fired at Linnmoore Street —the location where Santos's body was later found—Santos's phone traveled "with the Williams-Bey phone" into an area of north Hartford over 4 miles from 323 Linnmoore Street. Tr. 1417. The cell phone records then show Williams-Bey's phone traveling southward, moving around in Hartford, before traveling east. Tr. 1418-21; GX-80A at 11-14. Williams-Bey's phone ended its journey "in and around the Perez residence," in East Windsor, Connecticut, Tr. 1421, and stayed there until the afternoon of August 13th, Tr. 1423. Williams-Bey was romantically involved with Alicia Perez in August 2013, Tr. 829, and would "[o]ften" stay over at her home during this period, Tr. 830.

### d. Burgos Testimony

Jennifer Burgos also testified at trial, and a rational juror could have found further evidence of Williams-Bey's guilt by drawing inferences from both the substance and circumstances of her testimony in the context of the other evidence in this case.

Burgos was in a romantic relationship with Williams-Bey during the period in which Santos was murdered, and this relationship terminated shortly after Santos was killed in 2013. *See* Tr. 768-69. Specifically, Burgos and Williams-Bey fought the night that Santos was murdered, and Burgos kicked Williams-Bey out of their shared apartment, then moved in with her mother, and then to New Orleans, Louisiana in 2014. Tr. 767-69. She eventually married someone else while living in New Orleans. *See* Tr. 707. While she lived in New Orleans with her

husband in 2019, she testified before the grand jury in this case. Tr. 706. Sometime after she testified to the grand jury in 2019, Burgos divorced her husband, Tr. 691, moved back to Connecticut, and fully resumed her relationship with Williams-Bey, with whom she was "still very much in love" during the trial, Tr. 693, and with whom she has a young daughter, Tr. 691. She had first reconnected with Williams-Bey in 2016, the year in which she conceived the daughter she shares with Williams-Bey. Tr. 772. At trial, Burgos agreed that as part of her relationship with Williams-Bey she is "there to support him." Tr. 798.

Burgos testified that during the first period in which she was in a romantic relationship with Williams-Bey, she did not know him to ever have a job. Tr. 701.[6] Instead, he was "in the streets," Tr. 701, which she explained to a grand jury meant that he "had to have been" selling drugs, Tr. 741.[7]

Burgos also testified at trial about events in the period in which Santos was murdered. She recalled Williams-Bey waking her one morning by screaming at her that his money was gone and accusing her of taking his money. Tr. 713. She acknowledged that she had testified to the grand jury in 2019 that Williams-Bey said repeatedly that "[a]ll my money is gone" that morning, and that she did not know what he was talking about. Tr. 715. And before the grand jury, she answered "[n]o" when asked if she had "ever seen [Williams-Bey] that angry before." Tr. 716. Burgos also testified at trial that the exterior door into her apartment building was routinely unlocked, such that anyone could walk into the building. Tr. 715-16. To the grand jury, she added that during the time in which the money was stolen from the apartment she shared with Williams-Bey, the lock on the apartment's front door did not work. Tr. 718-19.

---

[6] Nor did Perez, another woman with whom Williams-Bey was involved, know Williams-Bey to have a job. Tr. 830.
[7] The jury was entitled to treat Burgos's grand jury testimony, portions of which were introduced at trial to impeach her, as substantive evidence. Fed. R. Evid. 801(d)(1)(A).

At trial in 2022—after Burgos had returned to Connecticut and fully resumed her relationship with Williams-Bey—she partially recanted the grand jury testimony she gave before resuming her relationship with Williams-Bey, claiming that she did not remember making some of those statements or that there "was a misunderstanding." Tr. 719. Instead, she testified at trial that Williams-Bey was not angrier than she had ever seen him, but instead seemed "just upset," Tr. 715-16, and that Williams-Bey did not scream at her, Tr. 720-21. Burgos also claimed at trial that the lock on the apartment front door was functioning. Tr. 715. And though in 2019 she told the grand jury she did not know what Williams-Bey was talking about when he was screaming at her about his missing money, Burgos now advanced a new theory about the money: that she "in fact, [took] money from [Williams-Bey,]" Tr. 717, and this money was shared money that she and Williams-Bey "were saving for furniture," Tr. 722.

Burgos's claimed failure of memory extended to the text messages she exchanged with Williams-Bey on August 13, 2013, the day Santos's body was discovered. She did not recall text messages that she exchanged with Williams-Bey on this day, many of which "talk a little bit about the fact that [Burgos] and [Williams-Bey] are fighting about coming and getting his stuff out of the apartment." Tr. 776. For example, Burgos texted Williams-Bey to "Call me please" at 1:16 am on August 13, 2023, and followed that text at 2:44am with another that said "U didn't have to do me like this don't look for me yo," and another at 10:56am stating "Hope u slept well buck cause I'm done with all that." GX-85 at 1.[8] At 11:01am, Burgos then wrote to Williams-Bey "Don't wonder why I went missing u obviously don't need me & since u doin the same stuff it's clear to me that u wasting my time," and at 11:37am "never be around to protect me so ima protect myself from u and whatever comes my way." *Id.* She followed this text with a long

---

[8] These text messages are recorded in GX-85, which was admitted as a full exhibit. Tr. 778.

message sent at the same time, part of which read "U doin what s best for u and u only so I gotta do what s best for me U can hide anywhere I can t I m the one who stays home and if I m not home I my moms and everyone knows that." *Id.* Burgos later texted Williams-Bey at 12:16pm on August 13, 2013: "U think this a game buck fuck u and whatever bitch u been stayin with I m not stupid Take ur shit to her fuckin house before I take it myself Don t let me find out who she is either cause now ima ahow u crazy for u doing this shit to me Don t look for me and give my keys to Kaila Ima change my number and forget about u." *Id.* Burgos agreed at trial that these texts show her "getting angrier with [Williams-Bey]" about his "infidelity." Tr. 779.

Later in the day of August 13, Burgos demanded the apartment keys from Williams-Bey and continued to text Williams-Bey "about the keys and getting into the apartment and getting stuff out of the apartment." Tr. 782-83. She texted Williams-Bey at 4:34pm: "Yo buck on some real shit ima pack ur shit and take it to Mack house." GX-85 at 3. After ten more similar messages, at 5:39pm Burgos texted Williams-Bey that he must "Take it all out before I fuckin get there buck." *Id.* at 3. Burgos agreed that this text exchange was about removing Williams-Bey's things from their shared apartment, while he was telling her "not to touch his stuff," and that "it's clear from the content" of the messages that she continued "to be angry with" Williams-Bey. Tr. 784-85. Then at 6:04pm, Burgos texted Williams-Bey and demanded that he "Open my fuckin door buck," *id.* at 4, from which a rational juror could infer that she was outside of the apartment she shared with Williams-Bey and that Williams-Bey was inside of the apartment, despite Burgos testifying at trial that she did not recall seeing Williams-Bey at all on August 13, Tr. 786.

Williams-Bey and Burgos did not text again until 6:59pm on August 13. At that time, Burgos texted Williams-Bey using a different tone: "U gonna worry regardless but trust me when

I tell u that u not going down on my watch You are me and we in this together as much as I hate what I gotta put up with." GX-85 at 4. Williams-Bey later texted Burgos at 7:41pm and told her that she should talk to Baez. *See id.* at 4. At this point in time, Burgos knew that Baez could not locate Santos because she had already called Burgos looking for him. Tr. 788. But Burgos replied at 7:42pm: "I got it but I don't feel bad so I don't want her to hear it thru my voice that I ain't sad." GX-85 at 5.

Then at 9:36pm, Burgos texted Williams-Bey: "But listen I m gonna try to trust u with this not comin home stuff please don t step on my toes and let me find out u stayed at any girl house buck I swear I will really lose it I wanna trust again cause its so hard to do with u but ima try Please please please don t lie to me about nothing." *Id.* After an additional exchange of messages, Burgos texted Williams-Bey at 10:39pm "My heart hurts so bad knowing I won't be waking up next to u." *Id.* at 6.

But within an hour of that text message things soured again between Burgos and Williams-Bey, as multiple text messages from Burgos demonstrate that she learned that Williams-Bey was at the Perez household. *See id.* at 6-7. Burgos testified that these texts show that "it's apparent to [her] now that even though [she] thought [she] could trust [Williams-Bey] again, [she] can't trust him." Tr. 791. She never returned to live with Williams-Bey at the Merrill Street apartment they had shared, instead staying with her mother until she moved to New Orleans. Tr. 768.

Burgos also testified about the period after this exchange of text messages with Williams-Bey. She testified that she did not attend Santos's funeral despite considering herself friends with Santos and Baez. Tr. 794. She testified that despite hearing rumors that Williams-Bey murdered Santos, she "[n]ever asked him about it." Tr. 796. Indeed, Burgos was "not concerned about the

circumstances of Mr. Santos's murder" and did not "really want to know the circumstances of Mr. Santos's murder" when she testified to the grand jury in 2019. Tr. 799.

A rational juror could infer from the substance of Burgos's testimony that money was stolen from Williams-Bey. He or she could also infer from the text messages between Burgos and Williams-Bey on August 13, 2013, that Burgos and Williams-Bey reconciled and Burgos learned that Williams-Bey murdered Santos during this reconciliation. The text messages suggest that Burgos spent most of the day angrily texting Williams-Bey, met with him and reconciled at their shared apartment, and then shortly after that meeting texted Williams-Bey that he was "not going down on my watch," GX-85 at 4, despite earlier that day telling Williams-Bey "don't look for me," *id.* at 1, because she was "done with all that" and was going to "change my number and forget about u," *id.* The evening that Burgos reconciled with Williams-Bey, which was the evening of the day that Santos's body was discovered, Burgos told Williams-Bey that she did not want to talk to Baez because she did not "feel bad" and did not want Baez to "hear it thru [her] voice that [she] ain't sad." *Id.* at 5. And Burgos testified that she never attended Santos's funeral despite being friends with him and Baez. She also testified that she never asked Williams-Bey about the death of their shared friend. These facts, when combined with the evidence recounted above, suggest that Burgos learned on August 13, 2023, what happened to Santos: Williams-Bey murdered him in retaliation for the theft of drugs or drug proceeds from their shared apartment.

Beyond the substance of Burgos's testimony and the inferences a rational juror could draw from it, her demeanor when testifying at trial—including her obvious lies and omissions while testifying—suggested that she would do anything to protect Williams-Bey, and further contributed to a rational inference that Williams-Bey murdered Santos. During direct examination, for example, Burgos testified: that she did not remember when she was married and

when she became divorced, Tr. 691; that despite living with Williams-Bey she could not confirm whether he was a drug dealer and could not confirm whether he ever had any money, Tr. 701, though she testified to a grand jury in 2019 that he had to have been selling drugs, Tr. 741; that she had never seen the car other witnesses identified as belonging to Williams-Bey, Tr. 702; that she never asked Williams-Bey what he was charged with after being arrested at her mother's apartment, did not know whether police had recovered drugs from that apartment, and never asked her mother about Williams-Bey's arrest, Tr. 703-05; that she did not recall an FBI agent calling her about this case and her blocking his number, despite so testifying to the grand jury in 2019, Tr. 707, 766; that she did not recall testifying to the grand jury that Williams-Bey told her that all of his money was gone and she did not know what he was talking about, Tr. 715; that she did not recall Williams-Bey being furious about his missing money despite testifying to the grand jury in 2019 that she had never seen him that angry before, Tr. 716; that in fact she had taken money from Williams-Bey despite telling the grand jury in 2019 that she did not know about any missing money, Tr. 717; that she did not recall Williams-Bey screaming at her about the missing money despite telling the grand jury he had screamed at her, Tr. 720-21; that despite telling the grand jury in 2019 she did not know anything about the money, in 2022 she recalled that the money was actually money she was saving with Williams-Bey to buy furniture, Tr. 722-23; that she did not recall any of the text messages that she exchanged with Williams-Bey around the time of the murder, including her message that "you're not going down on my watch," Tr. 773; and that she did not recall whether she asked Williams-Bey if he killed Santos, despite hearing rumors that he had done so and testifying to the grand jury that she never asked him, Tr. 794-96. Burgos also admitted to lying to the grand jury about who the father of her child was. Tr. 772-73.

Apart from the incredible content of her testimony, Burgos's demeanor throughout her examination suggested she was bent on helping Williams-Bey and hurting the Government's case as much as she could. Her apparent invention of the testimony about the money in the microwave being reserved for "furniture" is just one example of her obvious efforts to bend over backwards to help her lover. A rational juror could infer from her bias, untruthfulness, and demeanor, when combined with the substance of her testimony, her text messages, and the Government's other evidence, that she was attempting to help the defendant because she knew he was guilty, i.e., that she was doing her part to ensure that he did not, in her words, "go[] down on my watch." GX-85 at 4.

### e. Other Evidence

#### i. *Baez Testimony*

Other evidence from events occurring after the murder also implicated Williams-Bey. The day after the murder, Kimberly Baez, Santos's girlfriend, Tr. 192, testified that Williams-Bey called her, Tr. 218. She was surprised to receive a call from Williams-Bey because "he never had [her] number or called [her] before," nor had she ever called him before. Tr. 218. Baez interpreted Williams-Bey's call as accusing her of telling people that he had murdered Santos, but she had "never said that he did anything." Tr. 219-21. After that call, Baez never heard from Williams-Bey again. Tr. 225.

Baez also testified that a funeral was held for Santos sometime after the murder. Tr. 223-24. There was testimony that Williams-Bey, Burgos, Santos, and Baez were friends who socialized together as a foursome, Tr. 699, 803, that Burgos and Baez were friends, Tr. 225, 699, and that Williams-Bey and Santos were also friends, Tr. 196, 1170-71. Yet Baez testified that neither Williams-Bey nor Burgos attended the funeral or expressed condolences after Santos was

murdered. Tr. 224. And despite Burgos and Baez being friends in August of 2013, shortly after

Santos was killed Baez did not communicate with Burgos for nearly ten years, until one month

before the trial in this case when Burgos called her to "invite[] me to her daughter's party." Tr.

225.

ii.    *Williams-Bey's Admissions to Law Enforcement*

Williams-Bey also made statements to law enforcement from which a rational juror could

infer additional evidence of guilt. Approximately ten days after the murder, on August 22, 2013,

then-detective Luis Poma interviewed Williams-Bey about the murder of Santos. Tr. 1164-65.[9]

Poma testified that at this interview, Williams-Bey stated that "it was crazy that people

were throwing out his name [in connection with the murder of Santos] because he was the last

one that had been in communication with [Santos.]" Tr. 1166. But Poma recalled Williams-Bey

admitting "that he had been with the victim," Santos, "earlier in the day . . . in Hartford." Tr.

1166. And when asked why he didn't attend Santos's wake or funeral, Williams-Bey said that he

did not want to because "[p]eople were angry, and they might avenge [Santos's] death and go

after him." Tr. 1171.

Poma then moved on to ask Williams-Bey whether he had stolen $10,000 from Santos.

Poma had information suggesting that $10,000 had been stolen from Santos, Tr. 1171, and he

hoped to confirm the suspected details of the robbery by asking this question, which would

implicate Williams-Bey. Tr. 1172. Williams-Bey responded that Santos "didn't even have

$7,000," which Poma found strange because he had stated a different amount. Tr. 1172. When

Poma attempted to memorialize the information Williams-Bey shared with him in a voluntary

statement, Williams-Bey refused to do so and ended the interview. Tr. 1173.

---

[9] Poma was the lead detective investigating Santos's murder during the initial investigation, but he retired from the Hartford Police Department in 2015 and is now an inspector for the Chief State's Attorney's Office. Tr. 1150-51.

* * * * * *

Williams-Bey argues that the evidence I have recounted above, which is only part of the Government's evidence before the jury in this case, was "not strong." ECF No. 215 at 8. Although it is true that the Government did not offer forensic or eyewitness evidence placing Williams-Bey at the murder scene, or recover the murder weapon, "the absence of any direct evidence that [Williams-Bey] killed [Santos] is not dispositive; the prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt." *U.S. v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002). Indeed, "a prosecution for murder may succeed without a body having been found or without evidence of the means of death being provided." *U.S. v. Sureff*, 15 F.3d 225, 228 (2d Cir. 1994). Williams-Bey also notes that the "law enforcement investigation also was unable to rule out other possible suspects," a defense presented by Williams-Bey at trial, and suggests that the Government's evidence gave nearly equal circumstantial support to competing explanations for the murder. ECF No. 215 at 9. But that suggestion does not fit this case, where the vast majority of the Government's circumstantial evidence implicated Williams-Bey. Viewed in the light most favorable to the Government, the circumstantial evidence described above—along with the testimony of Smith and Salmon that Williams-Bey confessed to the murder—was sufficient for a rational jury to find beyond a reasonable doubt that Williams-Bey killed Santos.

### 3. Sufficiency of the Evidence of Nexus between Murder and Drug Crimes

Williams-Bey argues that "[e]ven assuming . . . that the above evidence was enough for the jury to have concluded that Mr. Williams-Bey murdered Mr. Santos, there was insufficient evidence for the jury to have concluded that the killing was committed 'during and in relation to' and 'in furtherance' of a drug trafficking offense." ECF No. 215 at 9-10. In finding Williams-

Bey guilty of violating 18 U.S.C. § 924(j), the jury necessarily found that Williams-Bey murdered Santos in the course of violating 18 U.S.C. § 924(c). This means that they found that Williams-Bey either knowingly possessed a firearm "in furtherance" of a drug trafficking crime, or knowingly used or carried a firearm "during and in relation to" a drug trafficking crime, and used this firearm to kill Santos. ECF No. 190 at 40-43; *U.S. v. Kemp*, 21-1684-CR, 2023 WL 405763, at *3 (2d Cir. Jan. 26, 2023) (summary order) (to convict under § 924(j) "the government must prove that [defendant] used or carried a firearm in relation to a drug trafficking offense and used that firearm to murder the victim"). I instructed the jury on both the possession and use/carry theories of liability, ECF No. 190 at 40-43, and the jury returned a general verdict, ECF No. 192. "[W]hen divergent theories of criminal liability are submitted to the jury and the jury renders a general guilty verdict, on a challenge to the sufficiency of the evidence, if the evidence amply supports one of the theories presented the verdict must be affirmed." *United States v. Delano*, 55 F.3d 720, 730 (2d Cir. 1995). I thus must deny the motion for acquittal "if sufficient evidence supports either of the government's two theories." *Id.* at 731.

Williams-Bey primarily argues that "the evidence that the killing furthered Mr. Williams-Bey's drug trafficking was so meager that a judgment of acquittal is warranted." *Id.* at 13. In doing so, Williams-Bey emphasizes that there was no evidence "that the murder of Mr. Santos furthered, solidified, or expanded Mr. Williams-Bey's drug business," ECF No. 215 at 11, nor was there evidence that the killing was "intended to help Mr. Williams-Bey sell more drugs" or "intended to send a message to those who would threaten his business," ECF No. 215 at 14. These arguments focus on the "possession in furtherance" theory of liability, and Williams-Bey's briefing ignores almost entirely the "use/carry during and in relation to" theory of liability. And there was clearly sufficient evidence for a rational jury to conclude that Williams-Bey used or

carried a firearm during and in relation to the commission of a drug trafficking crime, though I find that it is a closer call whether there was sufficient evidence from which a rational jury could find that he knowingly possessed a firearm in furtherance of a drug trafficking crime. I thus must deny his motion for acquittal.

### a. Use/Carry During and In Relation Theory of Liability

A rational juror could have found that Williams-Bey used a firearm to murder Santos during and in relation to the predicate drug offenses. Under the during and in relation to theory of liability, "[u]se of a firearm in relation to a drug trafficking crime requires the government to demonstrate a nexus between the firearm and the underlying drug trafficking crime." *U.S. v. Munoz*, 143 F.3d 632, 637 n.5 (2d Cir. 1998) (internal quotation marks omitted, alteration in original). But the nexus between the firearm and the drug trafficking crime need not be drawn with great specificity because "[t]he phrase 'in relation to' is expansive." *Smith v. U.S.*, 508 U.S. 223, 237 (1993). Its inclusion in the statute was designed to "allay[] explicitly the concern that a person could be punished under § 924(c)(1) for committing a drug trafficking offense while in the possession of a firearm even though the firearm's presence is coincidental or entirely unrelated to the crime." *Id.* at 238 (internal quotation marks and alteration omitted). "[T]he firearm must have some purpose or effect with respect to the drug trafficking crime." *Id*. But the conviction must be sustained if "the firearm *had even the potential to facilitate* a drug trafficking crime." *U.S. v. Santos*, 64 F.3d 41, 45 (2d Cir. 1995), *cert granted, judgment vacated sub nom on other grounds Santos v. U.S.*, 516 U.S. 1156 (1996) (emphasis added). And "[f]acilitation may be found based on reasonable inferences derived from circumstantial evidence." *U.S. v. Melendez*, 60 F.3d 41, 47 (2d Cir. 1995), *cert. granted, judgment vacated sub nom. on other grounds Colon v. U.S.*, 516 U.S. 1105 (1996). In accordance with these principles, I instructed

the jury without objection as follows: "A firearm is used or carried 'during and in relation to' a drug trafficking crime if it has some connection to the drug trafficking crime and if its presence was not the result of accident or coincidence. The firearm must facilitate, or potentially facilitate, the drug trafficking crime." ECF No. 190 at 41.

Williams-Bey does not contest the "during" component of the "during and in relation to" theory of liability. Nor could he, because there was ample evidence that he was involved in drug trafficking during the period in which Santos was murdered. Salmon testified that Williams-Bey sold drugs in the spring and summer of 2013, and Salmon would sometimes buy drugs from Williams-Bey in this period. Tr. 348-49. Smith testified that Santos discovered the place where Williams-Bey hid drugs or drug proceeds during a drug transaction between Santos and Williams-Bey. Tr. 1261-63. And Salmon's testimony revealed that Santos was murdered soon after this location was revealed and Williams-Bey's drugs or drug proceeds were stolen. Tr. 367-75. And on August 22, 2013—only ten days after Santos was murdered—police officers recovered crack cocaine and heroin from a bedroom that Williams-Bey was staying in. Tr. 494-495, 498-504, 1487. The only other person who used this bedroom, Perez, testified that the drugs were not hers and that Williams-Bey used the drawer in which they were found to store his things. Tr. 837. The evidence thus plainly showed that Williams-Bey was involved in drug trafficking during the period in which Santos was murdered.

As to the "in relation" portion of the standard, Williams-Bey's use of a firearm to murder Santos in retribution for the theft of drugs or drug proceeds had the *potential* to facilitate his drug trafficking. The Second Circuit has held that murder in retribution for the theft of drugs and drug proceeds satisfies the "during and in relation to" standard without discussing any evidence other than that required to establish that the theft and murder occurred. *U.S. v. Brown*, 374 Fed. Appx.

208, 209 (2d Cir. 2010) (unpublished). In that case, there was "clearly sufficient evidence for the jury to have inferred that [a defendant] was robbed of 25 pounds of marijuana and $47,000 in cash by the victim," so the "jury could have inferred that the purpose of the murder was to settle the dispute caused by the theft of drugs and drug proceeds," satisfying the in-relation-to requirement of § 924(j). *Id.*

The Government also cites several other cases that strongly suggest that the evidence it submitted at trial adequately established the in-relation-to component of § 924(j). In *United States v. Caraballo*, the court found sufficient evidence to sustain a § 924(j) conviction where the evidence established that the defendant murdered a co-conspirator in retaliation for the co-conspirator's theft of drugs from the defendant using a firearm acquired as part of the drug conspiracy. 5:12-CR-105, 2014 WL 3535347, at *9-10 (D. Vt. Mar. 6, 2014), *on reconsideration,* 5:12-CR-105, 2014 WL 3535348 (D. Vt. July 16, 2014), *aff'd,* 658 Fed. Appx. 595 (2d Cir. 2016) (unpublished). Similarly, the Third Circuit has held that a defendant whose "drug proceeds and [unlawful] pills were stolen," and who then "armed himself with a gun, enticed the burglar to return . . ., and then brandished the gun in retaliation" used the gun as a means of "protection or intimidation" to "facilitate and protect his drug trafficking," and thus satisfied the during and in relation to standard. *U.S. v. Best*, 639 Fed. Appx. 848, 852 (3d Cir. 2016) (unpublished). Potential facilitation is not a high bar. For example, evidence that "clearly establishes that the shooting was not accidental or coincidental" and that "the shooting could potentially facilitate the drug conspiracy as retaliation for cooperation with the police as an example to other conspirators" is sufficient to sustain a § 924(c) conviction. *U.S. v. Rodriguez*, 291 Fed. Appx. 977, 979 (11th Cir. 2008) (unpublished); *see U.S. v. Brown*, 560 F.3d 754, 761, 769 (8th Cir. 2009) (shooting in retaliation for theft of drugs and other valuable items sufficient

for during and in relation element of § 924(c)). The evidence against Williams-Bey was well within the ambit of potential facilitation established by these cases.

As I discussed at length above, the trial evidence showed that Santos and Williams-Bey had a drug dealing relationship. Tr. 352, 365 (Salmon testified Williams-Bey purchased heroin from Santos, who had good stuff); Tr. 1262 (Smith testified Williams-Bey had a "drug relationship" with Santos). There was also evidence that Williams-Bey revealed the secret location where he stored his drugs or drug proceeds to Santos during the course of a drug transaction. *See* Tr. 368-70 (Williams-Bey showed Santos this location while he was "moving fast"); Tr. 1261-63 (Williams-Bey revealed his hiding spot when he grabbed money from it during a drug transaction with Santos). So Santos learned about Williams-Bey's hiding place during and in relation to a drug transaction that occurred as part of a pre-existing drug relationship.

After Williams-Bey's drugs or drug proceeds were stolen, he told members of Orange Street that he "wasn't going out like that" about one week before Santos was murdered. Tr. 370. And only a few days before Santos was murdered, Williams-Bey kept "going on about" the theft, saying that "it wasn't going to go on like that" and that he "was going to handle it." Tr. 374. When this evidence is viewed in the light most favorable to the Government, a rational juror could have inferred from these statements that Williams-Bey was implying that anyone who steals drugs or drug money from Williams-Bey will pay for it. He was letting his associates know that he would "handle" any thefts affecting his drug business because he could not allow a successful theft "to go on like that."

Williams-Bey made these statements shortly after the theft, and shortly after he made the statements, Santos was murdered. *See Campbell*, 850 Fed. Appx. at 107 ("the close temporal

proximity of the murder and [victim's] thwarted robbery attempt" supported § 924(c)(1) nexus). And, as I discussed above, there was ample evidence from which a rational juror could find that Williams-Bey was the killer. Smith even testified that Williams-Bey stated he murdered Santos because he believed that Santos was the person who stole his drugs or drug proceeds. Tr. 1261.

Ultimately, the connection between Williams-Bey's murder of Santos and Williams-Bey's drug trafficking is that he committed the murder in retaliation for the theft of drugs or drug proceeds. Much like in *Caraballo*, Williams-Bey murdered Santos, someone with whom he was in a drug business relationship, in retaliation for the theft of his drugs or drug proceeds, which is sufficient to sustain a § 924(j) conviction. *Caraballo*, 2014 WL 3535347, at *9-10. Even had Santos not been in a drug relationship with Williams-Bey, murder in retaliation for the theft of Williams-Bey's drugs or drug proceeds is sufficient to sustain a § 924(j) conviction. *Brown*, 374 Fed. Appx at 209 (affirming denial of motion of acquittal on § 924(j) indictment where jury could infer defendant was robbed of drugs and drug proceeds by victim and defendant then murdered victim). And Williams-Bey arguably went further in drawing the nexus to his drug business than the defendant in *Caraballo*, telling other members of the Orange Street gang that he would seek retribution for this theft because he could not allow an unavenged theft from his drug business to stand. This is thus an "ordinary case" of use of a gun during and in relation to a drug crime, where a rational juror could infer that Williams-Bey used a firearm to "facilitate and protect his drug trafficking." *Best*, 639 Fed. Appx. at 852; *see Smith*, 508 U.S. at 238 (describing the "ordinary case" of use of a gun "in relation to" a drug trafficking offense as one "in which the gun merely facilitates the offense by providing a means of protection or intimidation."). Certainly, Williams-Bey's murder of Santos in retaliation for Santos's theft of Williams-Bey's drugs and drugs proceeds "could potentially facilitate the drug [trafficking] as retaliation" for the

theft. *Rodriguez*, 291 Fed. Appx. at 979; *see U.S. v. Brown*, 560 F.3d at 761, 769 (shooting in retaliation for theft of drugs and other valuable items sufficient for during and in relation element of § 924(c)). The murder also potentially served notice on Williams-Bey's associates, and others they might tell, that theft of Williams-Bey's drugs or drug proceeds would have deadly consequences, deterring them from interfering with his drug operation.[10]

Williams-Bey's attempts to distinguish the cases cited by the Government are not persuasive. He first argues that *Caraballo* is not on point because in that case there was evidence of "a sustained drug conspiracy" and that "the defendant killed the victim with the same firearm that was obtained and possessed as part of the defendant's participation in the § 924(c) drug conspiracy," whereas here there was scant evidence about the details of the drug relationship between Williams-Bey and Santos or the relationship the firearm had to the predicate drug offenses. ECF No. 221 at 4. But it is not necessary for Williams-Bey and Santos to have been in a sustained drug conspiracy to find that their drug relationship contributes to the necessary § 924(j) nexus. *See U.S. v. Peter*, 17 CR 054 (NRB), 2019 WL 2918226, at *10-19 (S.D.N.Y. July 8, 2019), *aff'd sub nom. U.S. v. Campbell*, 850 Fed. Appx. 102 (2d Cir. 2021) (unpublished) (denying during and in relation to insufficiency challenge to § 924(j) verdict where, inter alia, the defendants murdered two customers in retaliation for the customers' attempted theft of marijuana and marijuana proceeds). And though it is necessary to show a nexus between the predicate drug trafficking offenses and the use of the firearm for a § 924(j) conviction, the Government did not need to prove that the firearm was *acquired* in the conspiracy to show that its use in murdering Santos facilitated—or potentially facilitated—Williams-Bey's drug trafficking activities. *See*

---

[10] While there was evidence that the members of the Orange Street group sold drugs in the same neighborhood, there was no evidence that they shared profits. And so it would not have been implausible for Williams-Bey to have made the "it wasn't going to go on like that" statements to other Orange Street members as a veiled warning not to mess with his drug business—or so a rational jury could have found.

*Brown*, 374 Fed. Appx at 209 (firearm murder in retaliation for theft of drugs and drug proceeds sufficient for § 924(j) conviction). In other words, while the manner in which the gun was acquired might help establish the requisite nexus between the murder and the drug trafficking crime, it is not a necessary component of the nexus.

Williams-Bey next attempts to distinguish *Rodriguez* by arguing that it does not "discuss in any detail what evidence" established facilitation. ECF No. 221 at 4-5. In that case, as Williams-Bey does here, the defendant argued that the use of the firearm was "an act of personal animosity." *Rodriguez*, 291 Fed. Appx. 977 at 979. The *Rodriguez* court reviewed briefly the evidence at trial showing that the defendant discharged a firearm at a co-conspirator in retaliation for the co-conspirator's "report[ing] to law enforcement" the defendant's "involvement in the marijuana cultivation operation," noting that the trial evidence showed that "the shooting was not accidental or coincidental" and so the "shooting could potentially facilitate the drug conspiracy as retaliation." *Id.* The relative brevity with which the *Rodriguez* court dealt with the trial evidence suggests that, in its mind, the facts it emphasized were clearly sufficient to establish that the shooting occurred during and in relation to a drug trafficking offense. The opinion suggests that there was no need to discuss the evidence of potential facilitation in any greater detail. Similarly, here the evidence establishes that Williams-Bey murdered Santos with a firearm, and the shooting could potentially facilitate his drug trafficking; these facts match closely the facts the *Rodriguez* court found sufficient to sustain a § 924(c) conviction.

Finally, Williams-Bey briefly discusses two additional cases. First, he notes that the language cited by the Government from an Eighth Circuit case, *Brown*, comes from the section of the opinion discussing jury instructions and so is not relevant to his argument about evidence sufficiency. ECF No. 221 at 5 (discussing *Brown*, 560 F.3d at 767). But elsewhere in that

opinion the court considered the sufficiency of the evidence supporting a § 924(c) conviction and held that facts like the facts in this case (except that the shooting victim did not die) are sufficient to sustain such a conviction under a during and in relation to theory. *Brown*, 560 F.3d at 761, 769 (shooting in retaliation for theft of drugs and other valuable items sufficient). Second, Williams-Bey argues that the Third Circuit case *Best* does not support his conviction because in *Best* there was expert testimony about how drug dealers use guns to further their businesses, whereas in his trial there was no testimony—either lay or expert—on this topic. ECF No. 221 at 5-6 (discussing *Best*, 639 Fed. Appx. at 851-53). Without this testimony, he argues, a jury could not rationally conclude that "this killing was committed 'in furtherance of' or "during and in relation to'" Williams-Bey's drug trafficking. ECF No. 221 at 5-6. But the portion of the *Best* opinion to which Williams-Bey refers concerns the arguably more stringent in furtherance theory of liability, not the during and in relation to theory. In any event, it is common sense that a drug dealer's murder of someone who stole his drugs or drug proceeds could facilitate his drug trafficking business; the lack of expert testimony on this specific topic does not make *Best* inapposite or render Williams-Bey's conviction unsupported by the evidence. *C.f. United States v. Santos*, 541 F.3d 63, 72 (2d Cir. 2008) ("Because narcotics conspiracies are illicit ventures, disputes are frequently settled by force or the threat of force."); *U.S. v. Sureff*, 15 F.3d 225, 228–29 (2d Cir. 1994) ("drug trafficking is often attended by violence"); *United States v. Crespo,* 834 F.2d 267, 271 (2d Cir.1987) ("We often have taken judicial notice that, to substantial dealers in narcotics, firearms are . . . tools of the trade"), *cert. denied,* 485 U.S. 1007 (1988). Despite Williams-Bey's attempts to distinguish these cases, I find that they provide ample persuasive authority that the evidence in this case was sufficient to sustain Williams-Bey's § 924(j) conviction under a during and in relation to theory of liability.

### b.   In-Furtherance Theory of Liability

As to the in-furtherance theory of liability, "the requirement in § 924(c)(1) that the gun be possessed in furtherance of a drug crime may be satisfied by a showing of some nexus between the firearm and the drug selling operation." *U.S. v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001). The finding of "a specific nexus between the charged firearm and the charged drug selling operation" is a "fact-intensive inquiry well-suited to resolution by a jury," and "[t]he ultimate question is whether the firearm afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking, including protection of the drugs, proceeds, or traffickers." *U.S. v. Lewis*, 62 F.4th 733, 746 (2d Cir. 2023) (internal quotation marks omitted). On this theory, I instructed the jury as follows:

> To possess a firearm in furtherance of a drug trafficking crime means that the firearm helped forward, advance, or promote the commission of the drug trafficking crime. The mere possession of the firearm at the scene of the crime is not sufficient under this definition. The firearm must have played some part in furthering the drug trafficking crime in order for this element to be satisfied.

ECF No. 190 at 42.

Williams-Bey argues that the trial evidence discussed above was insufficient to establish an in-furtherance nexus between the murder of Santos and his drug trafficking activities. He asserts there was a lack of direct evidence that he committed the murder intending to further his drug business or conspiracy and argues that the Government needed to present evidence that the murder "was intended to help Mr. Williams-Bey sell more drugs, or it was intended to send a message to those who would threaten his business." ECF No. 215 at 14.

The "in furtherance" prong of § 924(c)(1), as incorporated in § 924(j), is, of course, satisfied when the Government submits evidence sufficient for a rational juror to conclude that Williams-Bey intended the murder to further the predicate drug trafficking crimes. *See, e.g., U.S.*

*v. Campbell*, 850 Fed. Appx. 102, 107 (2d Cir. 2021) (unpublished) (affirming 924(j) conviction where evidence allowed jury to conclude that defendants "participated in the [murder] with knowledge that the murder was in furtherance of [the] . . . marijuana conspiracy" because the murder was "punishment for [victim's] attempted robbery of [the] . . . Stash House" and sent "a message that such affronts to [the] marijuana operation would not be tolerated"). But the Government need only prove that the murder was motivated in part by an intent to further the predicate drug trafficking crime. *See U.S. v. Santiago-Ortiz*, 797 Fed. Appx. 34, 37 (2d Cir. 2019) (unpublished) (affirming 924(j) conviction where evidence allowed rational juror to conclude that defendant "murdered [victim], at least in part, to earn [co-conspirator's] respect and establish authority within the neighborhood, furthering the goals of the Flow heroin conspiracy"). [11] And the Government may prove this intent through circumstantial evidence. *See Lewis*, 62 F.4th at 745-46 (evidence sufficient to support § 924(c) conviction when loaded firearm was recovered with drugs packaged for distribution, defendant admitted the drugs were for distribution, and drugs and gun were easily accessible). The in-furtherance theory of liability is thus satisfied if the Government submits evidence from which a rational juror could infer that at least one motive for the murder was to further the predicate drug crimes and the murder afforded some advantage—actual or potential—relevant to the predicate drug offenses.

I acknowledge that a rational jury would have had to look harder in this case to find evidence that Williams-Bey's murder of Santos provided an actual, concrete advantage to Williams-Bey's drug trafficking activities. As the defendant notes, there was no evidence that the

---

[11] Regarding both theories of liability, Williams-Bey argues that the evidence suggests that his motive for murdering Santos was a personal one. ECF No. 215 at 13. But "there is no inconsistency between a crime that is motivated in part by personal objectives and a finding that the crime was also committed at least in part for purposes related to a criminal enterprise." *U.S. v. Capers*, 20 F.4th 105, 115 (2d Cir. 2021) (internal quotation marks omitted). Based on the evidence, a rational juror could have found a mixed motive, and such a finding is not legally problematic.

murder increased Williams-Bey's (or Orange Street's) drug sales, eliminated a competitor, or consolidated drug territory in the city of Hartford. The Government argues in its brief that the murder "facilitated [Williams-Bey's] drug operation" by serving "notice to other Orange Street members (and customers)" that stealing drugs or drug proceeds "will not be tolerated and will result [in] deadly repercussions," such that the murder "deterred others from stealing from or interfering with [Williams-Bey's] drug operation." ECF No. 218 at 12. As discussed above, I agree with the Government on this point to some extent. Williams-Bey's telling his Orange Street associates "it wasn't going to go on like that" and he would "handle it" did serve them with notice that he would not tolerate theft from his stash, even by friends and associates, of which Santos, though not an Orange Street member, was one. But there was no evidence at trial that Williams-Bey's message to his associates, or knowledge that he had killed Santos because Santos had invaded his stash, spread beyond his Orange Street associates. Still, it does tend to "forward, advance, or promote," Jury Instructions, ECF No. 190 at 42, the crime of possession with intent to distribute controlled substances to let one's associates—themselves drug dealers and criminals—know that one intends to kill anyone who steals from one's drug and cash stash and then to follow up on that notice by carrying out one's stated intent in a way that one's associates learn about it. If nothing else, it dispels any perception that one can be taken advantage of without consequence and conveys unmistakably that the associates might meet the same fate if they seek to interfere with one's business. Indeed, the murder alone "help[s] forward advance or promote" the crime of possession with intent to sell, at least in a limited sense, by preventing a repeat theft by the murder victim. Here, the murder victim himself was a drug business associate of Williams-Bey who was known by the Orange Street gang to have a history of robberies, Tr. 1263, who had been in Williams-Bey's apartment and seen the hiding place for

his stash, and whose perceived theft took place at a time that the lock on the apartment door was not functioning—or at least so a rational jury could have found. Given those circumstances, a rational jury could infer "forward[ing], advanc[ing]" or "promot[ing]," at least in the limited sense that the murder, carried out with a firearm, was aimed at preventing (and did prevent) a repeat theft by Santos.

A rational juror could conclude that Williams-Bey intended to murder Santos in reprisal for Santos's theft of Williams-Bey's drugs or drug proceeds, and that this murder furthered Williams-Bey's drug trafficking business by deterring other potential thieves, at least among the Orange Street crew, and also by preventing Santos from stealing from his drug business again. *See Best*, 639 Fed. Appx. 852 (affirming § 924(c) conviction on in furtherance theory with similar facts; only material difference is expert testimony about how "drug dealers use guns to 'get revenge,' 'earn respect on the street' and not appear 'weak'"); *Caraballo*, 2014 WL 3535347, at *9-10 (upholding § 924(j) conviction on in furtherance theory with similar facts).

### B.    Rule 33 Motion for a New Trial

#### 1.    Sufficiency of the Evidence

Williams-Bey argues that even if I do not overturn his conviction under Rule 29, I should grant a new trial under the more flexible Rule 33 standard because the dearth of evidence to support his conviction warrants a new trial. In particular, Williams-Bey argues that the testimony of the cooperating witnesses, Salmon, Smith, and Dudley, was so problematic as to warrant a new trial because: (1) the cooperating witnesses' testimony, even if accepted as true, was inadequate as the sole basis for the jury to find that Santos was murdered in furtherance of, or during and in relation to, the predicate drug trafficking crimes, and (2) the cooperating witnesses' testimony was incredible. ECF No. 215 at 16-21.

In support of his first argument, Williams-Bey asserts that the cooperator testimony "suggested that Mr. Williams-Bey had a personal motive to kill Mr. Santos," rather than one related to drug trafficking, *id.* at 17, and that Salmon's testimony did not suggest that the meeting between Santos and Williams-Bey on the night Santos was killed was related to drug trafficking, *id* at 18. But as I mentioned above*, (see* note 11, *supra*) the Government did not need to prove that Williams-Bey's sole motive in murdering Santos was drug related. Instead, the jury needed only to be able to "rationally infer that at least one motive for [Santos's] murder was connected to the narcotics conspiracy" or drug possession offenses. *U.S. v. Kemp*, 21-1684-CR, 2023 WL 405763, at *3 (2d Cir. Jan. 26, 2023) (citation omitted). For reasons I have already discussed, the trial evidence, including the evidence that Santos was a drug business associate who discovered the hiding place for Williams-Bey's stash during a drug transaction in Williams-Bey's apartment and Williams-Bey's statements shortly after the theft of his stash of drugs and drug proceeds that he "wasn't going out like that" and would "handle it," was sufficient to infer that at least one motive for Santos's murder was related to Williams-Bey's drug trafficking; and that evidence was also enough to convince me that the jury's verdict was not a "manifest injustice."

Williams-Bey also attacks the credibility of the cooperating witnesses in this case, arguing that the circumstances leading to their cooperation rendered their testimony incredible. A defendant seeking a new trial based on witness credibility must show "exceptional circumstances," such as that the challenged testimony is "patently incredible or defies physical realities." *Ferguson*, 246 F.3d at 134. Such circumstances do not exist in this case.

The testimony of Smith and Salmon was consistent with other trial evidence. For example, each testified that Williams-Bey said that he kept his drugs or drug proceeds in the microwave of his apartment, that Santos was the only other person who knew that, and that

someone stole these items from Williams-Bey. Tr. 368-70 (Salmon); Tr. 1262-63 (Smith). Salmon also testified that Williams-Bey told him that he and Santos travelled to the murder location in Williams-Bey's vehicle, Tr. 389-90, which is consistent with testimony from Santos's friends that Santos left his car with them while he went elsewhere and intended to retrieve the car later, Tr. 862-63; Tr. 948-49. And Salmon's testimony about the 9mm caliber of the firearm Williams-Bey told him he used to murder Santos matched the casings recovered from on and around Santos's body. Tr. 391 (Salmon testimony); Tr. 549 (ballistic evidence). His testimony also matched the pattern of wounds on Santos. A forensic examination revealed that Santos was shot at least 10 times, *see* Tr. 311-15, 317, primarily in his back, legs, and buttocks, *see* Tr. 311-321. Salmon testified that Williams-Bey told him that his firearm malfunctioned, allowing Santos time to begin running away, before Williams-Bey fixed the firearm and then "emptied the clip" into Santos, Tr. 390. Salmon's testimony was buttressed by the testimony of Dudley and Smith, who each recalled Williams-Bey being concerned about information that Salmon possessed. Tr. 602-08 (Dudley); Tr. 1252-53, 1256-58 (Smith).

Smith's testimony was also corroborated by forensic evidence. He testified that Williams-Bey told him that Williams-Bey shot Santos while being "right up on him," after which Santos "was on the floor trying to crawl like he was still alive." Tr. 1260-61. This is consistent with evidence that shell casings were recovered on or very close to Santos's legs, Tr. 136, including underneath Santos's body, Tr. 142-43, and that this casing pattern suggested that Santos was shot at close range, Tr. 891. It is also consistent with testimony that when Santos's body was discovered "[h]is right hand appeared like he's clutching the ground, almost like he was attempting to crawl away" and it looked like "he had a handful of grass and dirt." Tr. 892.

To be sure, there were some inconsistencies in the testimony of Salmon and Smith. Salmon recalled both drugs and money having been stolen from Williams-Bey, Tr. 368, while Smith recalled only money, Tr. 1262. Salmon also recalled Williams-Bey saying that Torres accompanied him when he murdered Santos, Tr. 390, whereas Smith recalled Williams-Bey saying that Torres and Acoff were both present during the murder, Tr. 1260. But these minor details are "hardly critical points" and "[a]ny such inconsistencies do not provide a basis for casting aside the jury's verdict." *U.S. v. Johnson*, 452 F. Supp. 3d 36, 63 (S.D.N.Y. 2019), *aff'd*, 861 Fed. Appx. 483 (2d Cir. 2021) (unpublished) (internal citations omitted). Based on the overall fit between the testimony of the cooperating witnesses and the other trial evidence, I cannot find that the testimony was patently incredible or in defiance of physical reality.

In any event, Salmon, Smith, and Dudley were "subject to lengthy and vigorous cross-examinations, which fully explored their past crimes, motivations to testify, and any inconsistencies in their accounts." *Id.* Indeed, on cross-examination defense counsel engaged in a colloquy with Smith on lying. Tr. 1335-37. He elicited testimony from Salmon that Salmon had never lied in his life. Tr. 474. And he obtained an admission from Dudley that Dudley had lied in the past and that he cooperated with the Government because it was the right thing to do—not because he would receive any benefit for his cooperation. *E.g.,* Tr. 671-72. Williams-Bey thus "had the benefit of three attorneys through trial who worked very diligently to assail all of the many contradictions and weaknesses in these witnesses' accounts as well as to underscore the incentives they had to testify falsely." *U.S. v. Stanley*, 3:15-CR-00198 (JAM), 2019 WL 103773, at *10 (D. Conn. Jan. 3, 2019), *aff'd,* 808 Fed. Appx. 25 (2d Cir. 2020) (unpublished). And I instructed the jury that cooperating witnesses have interests "in this case different than any ordinary witness" because they "may have a motive to testify falsely," and that jurors should

"examine such testimony with caution and weigh it with great care." Tr. 1636-37. The jury was thus aware of the specific credibility issues with each cooperating witness and of their role in weighing cooperator testimony. Notwithstanding all this, I find that a rational jury could have credited that testimony, which, as discussed above, was corroborated by other evidence the Government introduced.

The facts of this case do not meet the high bar set by the Second Circuit for granting a new trial based on cooperating witness credibility concerns. *See U.S. v. Truman*, 688 F.3d 129, 139–40 (2d Cir. 2012) (district court should not have concluded that testimony was incredible and granted new trial though cooperating witness breached his cooperation agreement, Government effectively repudiated his testimony, witness had criminal record and history of alcohol and drug abuse, witness's attorney asserted witness perjured himself in related state court trial testimony, and witness refused to testify about certain aspects of crime and so defendant could not cross-examine him concerning related out-of-court testimony). Finding no manifest injustice, I decline to grant a new trial on this ground.

### 2.  Improper Questioning

Williams-Bey contends that Government counsel's conduct in questioning Burgos was prosecutorial misconduct so severe that a new trial is warranted. He first argues that the prosecutor improperly impugned the credibility of Burgos "by inserting himself into the proceeding as an unsworn witness." ECF No. 215 at 24. He then asserts that the prosecutor committed misconduct by asking Burgos whether she was accused of helping smuggle drugs into a detention facility. *Id.* at 25. Though these questions were improper, they did not create prejudice so severe that a new trial is warranted.

"To secure relief from conviction based on prosecutorial misconduct, a defendant must show that the misconduct resulted in substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *U.S. v. Aquart*, 912 F.3d 1, 27 (2d Cir. 2018) (internal quotation marks omitted). In assessing whether there was substantial prejudice, I consider "[1] the seriousness of the misconduct, [2] the measures adopted by the trial court to cure the misconduct, and [3] the certainty of conviction absent the improper statements." *Id.* (internal quotation marks omitted).

As to Williams-Bey's first argument, at trial the prosecutor asked Burgos about attempts FBI agents had made to contact her by phone and to serve her with a subpoena. Tr. 707-08. He asked Burgos whether she refused to open the door to the FBI agents when they came to subpoena her, and Burgos responded that she did not refuse to open the door. Tr. 707. The prosecutor then asked Burgos whether it was correct that the FBI agents "came on two separate days and knocked on [her] door, and [she] refused to open the door?" Tr. 708. Burgos replied "[n]o, sir." *Id.* The prosecutor then asked "[a]nd isn't it true that I was also there outside your residence in August of 2019?" and defense counsel objected. Tr. 708. I sustained the objection and Burgos did not answer the question. Tr. 708. I also admonished the prosecutor outside of the presence of the jury that his question was not proper and warned him not to ask a question like that again. Tr. 724.

A prosecutor may not pit his credibility against that of a witness or otherwise place the prosecutor's own credibility before the jury. *See U. S. v. Puco*, 436 F.2d 761, 762 (2d Cir. 1971) (ordering new trial where prosecutor asked questions that plainly represented a witness had made statements to him that were not in evidence and "in effect placed the credibility of the prosecutor himself before the jury"); *U.S. v. Washington*, 263 F. Supp. 2d 413, 430-431 (D. Conn. 2003),

*adhered to on reconsideration,* 294 F. Supp. 2d 246 (D. Conn. 2003) (ordering new trial when prosecutor "used questions [that were answered] to imply to the jury his contrary account of what" witness had said to him, strongly implying "that by virtue of his personal involvement, he knew" witness to be lying, and implying to jury that witness "was lying and had obstructed justice to aid the defendant"). The prosecutor in this case did pit Burgos's credibility against his own. He asked whether she had refused to open the door of her residence to FBI agents, which Burgos denied, and then he asked whether it was true that he was also present during this event. This question plainly implied to the jury that the prosecutor was present and that he had seen Burgos refuse to open the door, suggesting that Burgos was lying.

Nonetheless, the jury had already been instructed that if an objection is sustained they "must ignore the question that was asked and any answer that may have been given." Tr. 11-12. I had also already instructed the jury that "[a]ll statements, arguments, and questions by lawyers . . . are not evidence." Tr. 11. And I instructed the jury twice more during trial after this question was asked that questions by lawyers are not evidence. Tr. 740, 1626-27. These measures were adequate to cure any prejudice resulting from the prosecutor's question, which, as noted, Burgos did not answer.

Moreover, in the context of the other evidence offered at trial—in particular, the many occasions on which Burgos was effectively impeached with her grand jury testimony—the prosecutor's improper statement did not affect the certainty of Williams-Bey's conviction. The harm that might result from an improper question by a prosecutor of the sort involved here is the jury's disbelieving the witness's testimony because the prosecutor has pitted his credibility against hers. But I find that no such harm could have resulted in this case. As I discussed above, Burgos's testimony was so punctuated by impeachment and so replete with obvious lies that the

43

prosecutor's question could not have damaged her credibility any more than it already was, even had I not given curative instructions.

Williams-Bey also identifies a question posed by the prosecutor about an ongoing investigation of Burgos and Williams-Bey in Rhode Island as constituting prosecutorial misconduct sufficient to warrant a new trial. After Burgos repudiated her grand jury testimony about the money allegedly stolen from Williams-Bey, the following exchange occurred:

> MR. LEAMING: Ms. Burgos, Ms. Burgos, let's cut to the chase. You love this man [Williams-Bey], don't you?
>
> MS. BURGOS: Yes, sir.
>
> MR. LEAMING: You would do anything for him, wouldn't you?
>
> MS. BURGOS: Anything as in what, sir?
>
> MR. LEAMING: Anything. Whatever he asked you to do, you would do.
>
> MS. BURGOS: No, sir.
>
> MR. LEAMING: You would lie for him.
>
> MS. BURGOS: No, sir.
>
> MR. LEAMING: **Well, isn't it true that you're charged in a case in which you helped smuggle drugs into the detention facility**?
>
> MR. FROST: Objection, Your Honor.
>
> THE COURT: Let me see counsel.

Tr. 723 (emphasis and names added). I excused the jury and met with counsel. Tr. 723-24. I agreed with Williams-Bey's counsel that the subject the prosecutor sought to explore with that question was unfairly prejudicial and risked confusing and misleading the jury, sustaining defense counsel's objection and excluding any further questioning related to smuggling drugs into a detention facility under Federal Rule of Evidence 403. *See* Tr. 724-739.

Williams-Bey now claims that the question in boldface type above, in context, "utterly destroyed Ms. Burgos' credibility and simultaneously supported the government's trial theory that she also covered up for Mr. Williams-Bey in 2013." ECF No. 215 at 29. I disagree. First, when the jury returned, I gave a curative instruction:

> Ladies and Gentlemen, as I instructed you at the outset, I told you what evidence is and what evidence is not. Remember, questions by lawyers are not evidence. I sustained the objection to the question. You should ignore the question. You're not to draw any inferences from the question. You're not to speculate about what the answer might have been had the witness been permitted to answer the question. Okay? At this point there's no evidence on that issue. Okay?

Tr. 740. This curative instruction supplemented my earlier instructions that questions by lawyers are not evidence, Tr. 11, and was supported by my later instructions to the jury emphasizing this same point, Tr. 740, 1626-27. The cumulative effect of these instructions was sufficient to cure any misconduct. Further, while the question did imply that Burgos was involved in ongoing criminal conduct, as explained above, Burgos's credibility was already so compromised by her overall demeanor and the large number of occasions on which she was impeached that it is difficult to see how the question about her own alleged criminal activity could have "utterly destroyed" her credibility.

Also, the question itself did not mention Williams-Bey. To the extent the jury inferred that Williams-Bey was also implicated in smuggling drugs into the detention facility from the sequence of questions, there was extensive evidence that Williams-Bey was dealing drugs in 2013 around the time that Santos was murdered and for years after the murder. *E.g.,* Tr. 494-504 (drugs recovered in 2013 in Perez apartment where Williams-Bey sometimes stayed); Tr. 404-05 (testimony that Williams-Bey was arrested and charged with drug dealing again in 2017); Tr. 1509-10 (defense counsel eliciting testimony that Williams-Bey was charged in 2017 with conspiracy along with other members of Orange Street). And Williams-Bey was on trial for

45

murder, a far more serious crime than dealing drugs. These facts minimize any prejudice to Williams-Bey caused by the prosecutor's improper question. In light of all of the trial evidence, I do not find that this question, considered singly or cumulatively with the previous question, created a manifest injustice such that I should grant Williams-Bey a new trial.

### 3.   Limitations on Examination

Williams-Bey also claims that my evidentiary rulings during his counsel's examinations of Luis Poma, the lead investigator assigned to Santos's murder in 2013, "weakened Mr. Williams-Bey's ability to fully present" his defense of inadequate police investigation. ECF No. 215 at 31-32. The Sixth and Fourteenth Amendments guarantee Williams-Bey "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks omitted). "A defendant's right to present relevant evidence is not, however, unlimited," and courts may apply "evidentiary rules that serve the interests of fairness and reliability" to exclude defense evidence. *See Wade v. Mantello*, 333 F.3d 51, 58 (2d Cir. 2003). This includes preventing "unfettered cross-examination," as courts "may impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *U.S. v. Rivera*, 791 Fed. Appx. 200, 207 (2d Cir. 2019) (unpublished) (internal quotation marks omitted).[12] These limits are imposed using the familiar balancing framework, comparing "the probative value of the evidence against the potential for unfair prejudice." *Watson v. Greene,* 640 F.3d 501, 511 (2d Cir. 2011).

---

[12] I refer to cross-examination throughout this portion of the ruling even though Williams-Bey questioned Poma on both cross- and direct examination because Poma initially testified as a government witness whom Williams-Bey sought to confront, and cases on a defendant's defense presentation right usually arise in the context of cross-examination. Williams-Bey also called Poma as a witness in his case.

In the context of an inadequate police investigation defense, a defendant's presentation right is violated when a court prohibits an "entire line of questioning," such that the defendant is left without "*any* supporting evidence" and "without any support for his theory of the case." *Alvarez v. Ercole*, 763 F.3d 223, 232-33 (2d Cir. 2014) (emphasis in original) (right violated where defense strategy was to "introduce enough suspicion about the thoroughness of the . . . investigation to plant a reasonable doubt that the government met its burden of proof" but trial court barred any cross-examination on information in investigative reports, which was only evidence available on investigation thoroughness). But it is not violated when the court's preclusion of evidence is narrow and still permits examination about the investigative steps and other aspects of the police investigation. *Rivera*, 791 Fed. Appx. at 208 (no violation where evidentiary ruling precluded only a single hearsay statement, cross-examination on investigative steps continued, and court made ruling without prejudice to defendant "making a more well-developed showing as to why [evidence] survived Rule 403") (internal quotation marks omitted); *accord U.S. v. Rivera*, 799 F.3d 180, 186 n.4 (2d Cir. 2015) (no error for district court to impose "a reasonable limitation on a limited aspect of cross-examination"; presentation right violated when court curtails "all cross-examination as to issues").

The evidentiary rulings challenged by Williams-Bey are more like those in the *Rivera* cases than the one at issue in *Alvarez*. Williams-Bey argues first that his ability to explore the adequacy of the police investigation into Santos's murder was limited when I sustained objections to questions posed to Poma on cross-examination. ECF No. 215 at 32-33. These questions asked whether Poma had investigated Rashad or Sharad Collier, two friends of Santos, or identified other potential suspects in the murder. Tr. 1199-1200. I sustained objections to them because they were beyond the scope of the Government's direct examination of Poma, Fed. R.

Evid 611(b), and lacked an adequate evidentiary foundation. These questions, on cross-examination, were thus improper and could have confused the jury about the issues if answered. After I sustained these objections, defense counsel continued his examination of Poma. Among other things, he elicited testimony that Poma would have pursued any information he learned about whether people wanted to harm Santos had he received it. Tr. 1200. Poma also testified that if another detective learned about information relevant to the Santos murder, he would expect that detective to share the information with him, at which point he would document it in his report and attempt to interview anyone connected to that information. Tr. 1201-02.

Williams-Bey later recalled Poma in his case and conducted a direct examination. During that examination, defense counsel probed into possible missteps in Poma's investigation of Santos's murder. For example, defense counsel elicited testimony that Poma interviewed Rashad Collier and that during his investigation he received information that Santos entered a green Acura the night he was murdered, a different vehicle than the black Maxima the Government claimed Williams-Bey was driving. Tr. 1530-34. Poma also testified that despite learning this information he did not document anything more about the green Acura in his report, Tr. 1534, testimony from which one could reasonably infer that Poma did not pursue any leads related to the Acura because Poma separately testified that he documented things in his report when they were relevant, Tr. 1561. Poma also admitted to failing to preserve a Facebook post about Santos's death that was posted before Santos's body was recovered and so was likely relevant to the investigation. Tr. 1539-41. In response to continued questioning, Poma then testified that when he collected phone records and submitted them for analysis, he only included the phone records of Santos and Williams-Bey. Tr. 1537-38. Later, Poma testified that he usually investigates whether a victim had enemies when investigating a murder, that he had identified

48

other persons of interest in the Santos murder, and that by the time he concluded his investigation in 2015 he was unable to rule out any of those other names as persons of interest. Tr. 1561-64. On direct examination, then, Williams-Bey was able to explore with Poma his theory that the investigation into the murder was inadequate, bringing out testimony that tended to show that Poma did not pursue leads unrelated to Williams-Bey and that there were other suspects who were not ruled out.

The only problem that Williams-Bey identifies with his direct examination of Poma is that he was not allowed to ask Poma whether "the list of potential suspects in the case" was "potentially endless" by the time he left the investigation in 2015. ECF No. 215 at 33 (citing Tr. 1563). I sustained an objection to that question because it called for speculation. *See Wade v. Mantello*, 333 F.3d 51, 60–61 (2d Cir. 2003) (citing *DiBenedetto v. Hall,* 272 F.3d 1, 8 (1st Cir. 2001) favorably and quoting in parenthetical: "Evidence that tends to prove a person other than the defendant committed a crime is relevant, but there must be evidence that there is a connection between the other perpetrators and the crime, not mere speculation on the part of the defendant").[13] But I allowed defense counsel to pursue the subject matter of that question over the Government's objection by less speculative means, and Poma then testified that he had identified other names of interest over the course of his investigation and was not able to rule out any of them by the time the investigation ended in 2015. Tr. 1563-64. Based on this record, I cannot find that a new trial is warranted. My evidentiary rulings were narrow. And the topics I prohibited defense counsel from inquiring into on cross-examination were explored on direct examination when defense counsel recalled Poma, where defense counsel elicited ample evidence from Poma about the gaps in his investigation.

---

[13] As the Government notes, the question was also leading and called for an opinion from a lay witness. ECF No. 218 at 27.

49

Williams-Bey also ignores the testimony he elicited from other law enforcement agents supporting his theory that the investigation into the Santos murder was inadequate. For example, Agent Carney—the FBI case agent assigned to the Santos murder—testified on cross-examination that the Hartford Police Department obtained phone records for several phone numbers when they were investigating this case, including the records from Santos's phone, Williams-Bey's phones, Rashad Collier's phone, and "various females that were in the company of Mr. Santos on the day of August 12th of 2013." Tr. 1515. Detective Rykowski of the Hartford Police Department also testified on cross examination that he obtained several of these phone records, including those of Rashad Collier, because he thought they might be relevant to the Santos murder investigation. Tr. 937-38. Yet Carney confirmed that the Hartford Police Department did not do a cell site analysis for any numbers other than those of Santos and Williams-Bey. Tr. 1515-16.

And Carney testified that this choice had consequences for the investigation when the FBI became involved in 2016. He was unable to identify the users of any of the other phone numbers that had been in contact with Santos's phone on the night of the murder because "it was too far down the line," meaning that too much time had passed, and so he did not analyze those other phone numbers. Tr. 1516-17. Earlier, Carney had testified that people involved in drug activity frequently have multiple phones and change them periodically. Tr. 1512-13. Together, these facts would have allowed the jury to infer that the inaction of the Hartford Police Department in the early years of the investigation made it more difficult for the FBI to investigate other persons of interest.

Given the examinations of Poma and the other evidence Williams-Bey developed,[14] and the fact that I instructed the jury directly on defendant's inadequate investigation theory, Tr. 1636, I do not find that he was prevented from "properly explor[ing] and present[ing] his defense theory to the jury," ECF No. 215 at 34. Williams-Bey's argument that I prohibited adequate "inquiry into the thoroughness of the investigation lacks foundation in the record" and he "had ample ammunition to argue on summation, as he did, that the police had jumped too quickly to the conclusion that [he] was the killer, and had passed up the opportunity to test that theory." *Watson v. Greene*, 640 F.3d 501, 512 (2d Cir. 2011); Tr. 1704-12 (Williams-Bey arguing in closing that "the Federal Government's investigation, just like the Hartford Police Department's investigation, was geared towards proving a rumor, not finding the truth."). I decline to grant a new trial on these grounds.

## IV.    CONCLUSION

For the reasons above, I deny Williams-Bey's motions for judgment of acquittal or a new trial, ECF Nos. 177, 214.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:  Hartford, Connecticut
        August 17, 2023

---

[14] Another example is testimony Williams-Bey cites from Smith that Santos was "doing robberies at the time," Tr. 1263, which, Williams-Bey argued, suggested "that the victims of those crimes may have wanted to exact retribution." ECF No. 215 at 9.